IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Danny E. French, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 05 C 0975 |
| v. | ) |
| | ) Judge Mark Filip |
| Hartford Life & Accident Insurance | ) |
| Company, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Danny E. French ("Mr. French" or "Plaintiff"), brings this action against

Defendant, Hartford Life and Accident Insurance Company ("Hartford" or "Defendant").

Plaintiff alleges that he has been denied disability insurance benefits to which he is

entitled under an employer-sponsored benefit plan subject to the Employee Retirement

Income Security Act of 1974 ("ERISA") § 502 (a)(1)(b) and § 502(c). (D.E. 13

(Amended Complaint).)[1] The case is before the Court on Defendant's summary

judgment motion (D.E. 20) and Plaintiff's cross-motion for summary judgment (D.E.

24). The primary subject at issue is whether the Defendant acted arbitrarily and

capriciously (the standard of review is not disputed) in concluding that Plaintiff is subject

to a pre-existing condition exclusion to certain long-term disability benefits coverage.

Secondarily, the parties move for summary judgment relating to the amount of certain

weekly short-term disability benefits that Plaintiff received.

---

[1] The designation "D.E." refers to the docket entry number of the cited document.

As explained below, under the applicable arbitrary and capricious standard of review, the facts support a grant of Defendant's motion for summary judgment as it relates to Plaintiff's claim for long-term disability benefits. Although the record is reasonably clear that Plaintiff's weekly short-term disability claim is meritless, the Court will give the Plaintiff the benefit of the doubt and will deny Defendant's summary judgment motion without prejudice as it relates to weekly short-term disability benefits. Both parties may promptly resubmit summary judgment filings, if they so choose, concerning the short-term disability benefits issue, as explained further at the end of this opinion.

I.      STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R .Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). There is no genuine issue for trial unless there is

2

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See, e.g., Anderson*, 477 U.S. at 248. As courts in this district have repeatedly noted, when, as here, parties have filed cross-motions for summary judgment, the analytical endeavor can require consideration of any legitimate factual disputes in the record as they bear on each movant's respective summary judgment claims. *See, e.g., Northern Contracting Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, \*46 (N.D. Ill. Mar. 3, 2004) (Pallmeyer, J.) ("In cases such as this involving cross-motions for summary judgment, 'the court must extend to each party the benefit of any factual doubt when considering the other's motion – a Janus-like perspective . . . . '") (quoting *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D. Ill. 1992)).

Under ERISA, the judicial standard of review for benefit determinations hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefit determination. *See, e.g., Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As a default, courts review benefit determinations under ERISA through the application of a *de novo* standard. *Id.* However, if the administrator or fiduciary is given discretionary authority to determine benefits eligibility, the decision will be reviewed under the deferential arbitrary and capricious standard. *See, e.g., Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). For a plan to convey enough discretion to a plan administrator to trigger the more generous review, the plan must "contain language that . . . indicates with the requisite if minimum clarity that a discretionary determination is envisaged." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000).

In this case, the ERISA-governed employee benefit plan (the "Plan") sponsored by Wal-Mart through its purchase of a group disability insurance policy, Policy No. GLT 205215 (the "Policy"), expressly states that the plan administrator has discretionary authority to interpret its terms. The Policy section titled "Interpretation of Policy Terms and Conditions" states that "The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (D.E. 22 ¶ 7; *Id.*, Ex. D at HA00014.) The Seventh Circuit has held that this very language warrants review under the arbitrary and capricious standard. *See O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 959 (7th Cir. 2001) ("The Plan at issue states that 'The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy.' Therefore, we shall review Hartford's decision deferentially.") (collecting cases). Plaintiff does not dispute that the arbitrary and capricious standard of review is appropriate.

Under the arbitrary and capricious standard, coverage determinations by a plan administrator should be overturned by a court only when they are "downright unreasonable." *James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (stating that a benefit determination will only be found arbitrary and capricious when "downright unreasonable," and explaining that the reviewing court's role is a limited one); *accord, e.g., Kobs v. United Wisconsin Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) (stating that, under arbitrary and capricious review, "the only question for us is whether the [plan] administrator's decision was completely unreasonable.") (citation omitted); *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 816 (7th Cir. 1997)

4

(teaching that the reviewing court does not interfere with the plan administrator's decision, even if it is not the result the court would have arrived at in the first instance, unless the administrator "not only made the wrong call, but . . . a downright unreasonable one") (internal quotation marks and citation omitted); *Hupp v. Metromail Corp. Special Severance Plan*, 133 F.Supp.2d 681, 688 (N.D. Ill. 2001) (Castillo, J.) (noting that the arbitrary and capricious standard is the "least demanding form of judicial review" and is "extremely deferential," but further noting that such review is "not a rubber stamp.") (collecting and quoting multiple Seventh Circuit cases; all internal citations omitted). The Seventh Circuit has emphasized that a finding that a plan administrator's decision was "downright unreasonable," or "completely unreasonable," requires more than a finding that the decision was "merely incorrect." *See, e.g., Herzberger*, 205 F.3d at 329; *Chojnacki*, 108 F.3d at 816.

When reviewing an administrator's decision under the arbitrary and capricious standard, the Court does not ask whether the court or a different plan administrator would or could have granted the benefits; questions of judgment or choices between competing reasonable outcomes are left to the plan administrator. *See, e.g., Dougherty v. Indiana Bell Telephone Co.*, 440 F.3d 910, 917 (7th Cir. 2006) ("Under this standard . . . we will uphold a benefit decision so long as that decision has rational support in the record. Questions of judgment are left to the plan administrator, and it is not our function to decide whether we would reach the same conclusion as the administrator.") (collecting cases; internal punctuation and citations omitted); *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 279 (7th Cir. 1994) ("The arbitrary and capricious standard does not require the committee's decision to be the only sensible interpretation of a plan, so long as its

5

decision offers a reasoned explanation, based on the evidence, for a particular outcome. If the committee's decision offers a reasonable explanation, their decision should not be disturbed even if another reasonable, but different, interpretation may be made.") (internal punctuation marks and citation omitted). In other words, when the arbitrary and capricious standard is applied, the decision of the administrator will be left undisturbed so long as the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts . . . ." *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993). Furthermore, when considering a claim under the arbitrary and capricious standard, the court may refer only to that evidence which was before the decisionmaker at the time of the decision at issue. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) (defining the boundaries of permitted discovery where a plan beneficiary challenges the disability determination); *accord, e.g., Krawczyk*, 41 F.3d at 279 (citation omitted).

II.    FACTUAL BACKGROUND[2]

   A.    **The Parties and the Policy**

---

[2] As Plaintiff has not filed a Statement of Facts or provided any record evidence to the Court, the Court takes the relevant facts from Defendant's Statement of Facts ("Def. SF") (D.E. 22) to the extent the facts stated in Def. SF are properly supported by record evidence. Where the parties disagree over relevant facts, the Court sets forth the competing versions, at least if they are supported by appropriate citations. In addition, the Court, as it must, resolves genuine factual ambiguities in the respective non-movant's favor. *See Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). As discussed further, *infra*, Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See, e.g.*, L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).

Plaintiff had been working for Wal-Mart Stores, Inc. ("Wal-Mart") for almost two years when he became a participant in the Plan on September 19, 2002. (D.E. 22 ¶¶ 5, 13.) Because he did not join the Plan when he first started working at Wal-Mart, Plaintiff was considered a "late enrollee" under the Policy's terms. (*Id.* ¶ 13.) On January 24, 2004, Plaintiff applied for Long-Term Disability Benefits (also "LTD Benefits") under the Policy with Hartford. (*Id.* ¶ 30.) Hartford denied Plaintiff's claim for LTD Benefits based on the Policy's Pre-Existing Conditions Limitations provision. (*Id.* ¶ 36.) The first issue for the Court is whether summary judgment is appropriate on the question of whether Hartford's denial of LTD Benefits to Plaintiff was or was not arbitrary and capricious.

The Policy defines a "Disability" to mean any: "(1) accidental bodily injury; (2) sickness; or (3) pregnancy." (*Id.* ¶ 8; *Id.*, Ex. D at HA00015.) The Policy also provides, with respect to payment of Total Disability benefits:

> You will be paid benefits if, while insured under the group policy, you:
> (1) become totally disabled;
> (2) remain Totally Disabled throughout the Elimination Period;
> (3) remain Disabled beyond the Elimination Period; and
> (4) submit proof of loss satisfactory to The Hartford.

For purposes of this motion only, Defendant assumes *arguendo* that Plaintiff would qualify as suffering from a Total Disability—*if* (and only if) the pre-existing coverage limitation were not applicable. (D.E. 21 at 11 n.2.) The operative dispute, therefore, relates not to Disability *vel non*, but rather to the preexisting condition exclusion in the Policy.

The Policy provides, under the heading "Exclusions," that "[t]he Plan does not cover and no benefit will be payable for any Disability which . . . [is] due to or contributed to by a Pre-Existing Condition." (D.E. 22 ¶ 10; *Id.* Ex. D at HA00028.) The Policy goes on to explain:

> Pre-Existing Conditions Limitations
>
> . . . No benefit will be payable under this Plan for any Disability that is due to, contributed to by, or results from a Pre-Existing Condition unless such Disability begins:
>
> (1) after the last day of 365 consecutive days while insured under this Plan on a full-time basis during which you did not receive Medical Care for the Pre-Existing Condition; or
>
> (2) after the last day of a 730 consecutive day period during which you were continuously insured on a full-time basis under this Plan.[3]

The Policy defines a "Pre-Existing Condition" as follows:

> Pre-Existing Condition means any Disability, diagnosed or undiagnosed, for which you receive Medical Care during the 365 day period which ends on the day before: (1) your effective date of insurance; and
>
> (2) the effective date of a Change in Coverage.
>
> All manifestations, symptoms or findings which result:
>
> (1) from the same or a related Disability; or
>
> (2) from any aggravations of Disability;
>
> are considered to be the same Disability for the purpose of determining a Pre-existing Condition.

The Policy goes on to define "Medical Care" as follows:

> Medical Care means care which is received when:
>
> (1) a Physician is consulted or medical advice is given; or
>
> (2) treatment is recommended or prescribed by or received from a Physician.

---

[3] Neither Party argues that these exceptions to the Pre-existing Conditions Limitations provision apply, and the record does not reveal any reason why they would.

Treatment, as used above, includes but is not limited to:

(1) any medical examinations, tests, attendance or observation;

(2) any medical services, supplies or equipment, including their prescription or use; or

(3) any prescribed drugs or medicines, including their prescription or use.

(D.E. 22 ¶¶ 9-12; *Id.*, Ex D. at HA00015-16, HA00028.)

Given these Policy terms, the first issue before the Court is whether the record supports a finding on summary judgment that Defendant was or was not arbitrary and capricious in determining that Mr. French's claimed Disability was "due to, contributed to by, or result[ed] from a Pre-Existing Condition," defined under the Policy as "any Disability, diagnosed or undiagnosed, for which [Mr. French] receiv[ed] Medical Care during the 365 day period which end[ed] on the day before" September 19, 2002.

## B.     Plaintiff's Medical History

On September 8, 2002—or before he enrolled in the Plan—Plaintiff injured his back while lifting 50 lbs. off of a conveyor at Wal-Mart. (D.E. 22 ¶ 14.) Plaintiff was treated that day in the emergency room for lower back pain, among other things. Two days later, on September 10, 2002, Plaintiff was seen at St. Margaret's Hospital and was diagnosed with acute cervical and lumbar strain. (*Id.* ¶ 15.) A lumbar X-ray taken that day revealed that Plaintiff had "minimal retrolisthesis of L4 and L5." (D.E. 22 ¶ 15; *Id.*, Ex. E at HA00633.) Plaintiff continued to have pain and subsequently consulted Dr. Gregg E. Davis, whom he saw twice in September 2002. On both occasions, Dr. Davis diagnosed Plaintiff with lumbar strain and noted that Plaintiff did not have any muscle atrophy, acchymoses, or abrasions, his gait and neurological exam were normal, and he

9

suffered pain over the left and right paraspinal muscles with spasms. (D.E. 22 ¶¶ 16-18.)
Still seeking treatment for his back, Plaintiff saw Dr. Jesse Weinger on September 30,
2002, who ordered an MRI of Plaintiff's cervical spine. (*Id.* ¶ 20.) Dr. Gerald L.
Palagallo read the MRI, which was conducted on October 8, 2002, and reported "minimal
first degree spondylolisthesis of L5 on S1." (*Id.*, Ex. E at HA00680.) Dr. Weinger noted
that the MRI "shows Grade I spondylo of L5 on S1" and "minimal or trace"
"[s]pondylolisthesis at L5." (*Id.*; *id.*, Ex. E at HA00676.) Plaintiff asserts, without
appropriate record support, that he was then "released to full duty on November 11, 2002
without any physical restriction." (D.E. 24 ¶ 8.[4]) Defendant agrees that Plaintiff returned
to work at Wal-Mart at some time between September 8, 2002 and June 3, 2003. (D.E.
22 ¶ 22.)

### C.     Plaintiff's Claimed Disability

Plaintiff was still working for Wal-Mart when he again suffered back pain on
June 3, 2003 while loading freight into semi-trailers at a distribution center in Spring
Valley, Illinois. (D.E. 22 ¶ 22.) Four days later, Plaintiff saw Dr. Davis, who again
diagnosed him with lumbar sprain and noted that Plaintiff did not have any muscle
atrophy, ecchymoses, or abrasions, and he suffered pain over the left and right lumbar
paraspinal muscles with spasms. (*Id.* ¶ 23.) On July 2, 2003, on the order of Dr. George
DePhillips, whom Plaintiff had begun seeing a few days earlier, Plaintiff had another
MRI scan of his lumbar spine. (*Id.* ¶ 24.) Dr. Steven Lukancic reported that the MRI

---

[4] As explained further elsewhere, the parties, and Plaintiff in particular, fail at times to support
their positions as required by L.R. 56.1. Where assertions are not properly supported, they are, as
precedent instructs, disregarded.

showed "bilateral spondylolysis at the L5 level with mild L5-S1 spondylolisthesis" with "slight posterior disc bulging" and "mild bilateral L5-S1 neural foraminal narrowing." (HA00554.) Upon receiving the MRI results, Dr. DePhillips told Plaintiff that "the only surgical option is a spinal fusion" and "recommended three months of conservative treatment," including physical therapy and a series of epidural steroid injections. (*Id.*, Ex. E at HA00533.)

Dr. Richard Shermer, an orthopedic surgeon, examined Plaintiff next on September 11, 2003, providing an independent medical evaluation. (D.E. 22 ¶ 25.) Dr. Shermer reviewed Plaintiff's MRI and CT scans from July 2, 2003 and found that they indicated "minimal L5 S1 spondylolisthesis" with "no evidence of disc herniation." (*Id.*, Ex. E at HA00753.) In addition, Dr. Shermer concluded that Plaintiff's "minimal L5 S1 spondylolisthesis and aspondylolysis of the pars". . . "are considered to be congenital in origin." (*Id.*, Ex. E at HA00755.) Dr. Shermer concluded that "L5 S1 spondylolisthesis based on review of the MRI study is very minimal and felt to be of no clinical significance." Based on these findings and a "clinical muscoskeletal evaluation" he conducted, Dr. Shermer did not find an indication for surgery and instead concluded that Mr. French "should be able to perform his work duties." (*Id.*, Ex. E at HA00754-755.)

After seeing Dr. Shermer, Mr. French continued to consult Dr. DePhillips in 2003. On October 22, 2003, Dr. DePhillips reported to Plaintiff's attorney, Louis Bertrand, that it was his opinion "within a reasonable degree of medical and surgical certainty that the injury that occurred on June 9th of [2003] caused an exacerbation of a preexisting condition, that is spondylolisthesis at the L5-S1 level." (D.E. 22 ¶ 26; *Id.*,

11

Ex. E at HA00531.) Dr. DePhillips explained that although the "spondylolisthesis at the L5-S1 level preexisted the injury . . . the accident at work caused an exacerbation of this condition resulting in lumbosacral instability and mechanical low back pain." (*Id.*, Ex. E at HA00531.)

To evaluate the source of Plaintiff's ongoing back pain, Dr. DePhillips referred Plaintiff to Dr. Scott E. Glaser for a discography, which was conducted on December 3, 2003. (D.E. 22 ¶ 27; *Id.*, Ex. E at HA00551-552.) Dr. Glaser summarized the results of the test as evidencing "discogenic lower back pain at the L5-S1 level" and diagnosed Mr. French with "lumbar discogenic pain" and "lumbar spondylolysis." (*Id.*)

Dr. DePhillips then referred Plaintiff to Dr. Michel Malek, a neurological surgeon, for a consultation on December 19, 2003. (D.E. 22 ¶ 28.) Dr. Malek concluded that Mr. French suffered "L5 spondylolysis and mild L5-S1 spondylolisthesis combined with discogenic pain" and that he was a candidate for "spinal fusion." (*Id.*) Dr. Malek told Dr. DePhillips that "probably these findings preexisted [Plaintiff's] injury, but probably aggravated his injury that rendered it symptomatic." (*Id.* ¶ 28; *Id.*, Ex. E at HA00527.) On January 13, 2004, Dr. DePhillips and Dr. Malek performed a surgical "lumbar decompression and spinal fusion" on Plaintiff. (*Id.* ¶ 29; *Id.*, Ex. E at HA00338.) Dr. DePhillips explained in a report he drafted that day that Plaintiff had "spondylolysis and discogenic pain at the L5-S1 level," but that "x-rays do not show gross instability at the L5-S1 level." (*Id.* ¶ 29; *Id.*, Ex. E at HA00338.)

### D. Defendant's Denial of Benefits

Shortly after his surgery, Plaintiff applied for LTD Benefits with Hartford. (D.E. 22 ¶ 30.) In support of Mr. French's application for LTD Benefits, Dr. DePhillips submitted two "Attending Physician Statements of Continued Disability" to Hartford. (*Id.* ¶ 31.) In a report stamped February 9, 2004, Dr. DePhillips listed his "primary diagnosis" of Mr. French as "deg lumbar disc." (*Id.* ¶ 31; *Id.*, Ex. E at HA00711.) In contrast, in a report stamped February 10, 2004, Dr. DePhillips listed his "primary diagnosis" of Mr. French as "lumbar spondylolisthesis," and noted that a "lumbar C.T." test and "physical examination" indicated "spondylolysis." (*Id.* ¶ 31; *Id.*, Ex. E at HA00707.)

At least three medical personnel reviewed Mr. French's initial claim for LTD Benefits under the Policy on Hartford's behalf. On March 1, 2004, Jonah E. King ("King"), a nurse, reviewed medical records from various doctors and hospitals that had treated Mr. French, including Dr. DePhillips, Perry Memorial Hospital, Dr. Davis, Dr. Malek, Dr. Weinger, Dr. Shermer, Dr. Glaser, and St. Margaret's Hospital, in evaluating Plaintiff's coverage claim. (D.E. 22 ¶¶ 32-33.) King concluded and reported that Mr. French's pre-existing conditions included right shoulder pain, cervical pain, lumbar pain, bilateral L5 spondylolysis with grade 1 L5-S1 spondylolisthesis, and bilateral pars defect. (*Id.* ¶ 33.) Upon reviewing Mr. French's claim and King's report, Hartford examiner Bradley D. Kodesh recommended that Hartford deny Plaintiff's claim under the Policy based on the Policy's "Pre-Existing Condition Exclusion." (*Id.* ¶ 34.) Hartford examiner Andrea Jolivet reviewed Kodesh's recommendation and confirmed her agreement on March 2, 2004. (*Id.* ¶ 35.) That same day, Kodesh sent Plaintiff a letter on Hartford's

13

behalf denying Plaintiff's claim for benefits under the Policy, explaining that Plaintiff's claimed Disability was excluded from LTD coverage by the Policy's pre-existing conditions limitation. (*Id.* ¶ 36.) Kodesh based this assessment, at least in part, on Dr. DePhillips's October 22, 2003 letter stating that Plaintiff's June 2003 injury exacerbated pre-existing spondylolysis at the L5 level with Grade 1 spondylolisthesis. (*Id.*)

Plaintiff appealed Hartford's March 2, 2004 coverage determination. (D.E. 22 ¶ 36.) In support of his appeal, Plaintiff submitted additional information to Hartford, including a letter from Dr. DePhillips dated June 21, 2004. (*Id.* ¶ 37.) In it, Dr. DePhillips states that Mr. French's June 9, 2003 injury led to a diagnosis of "lumbosacral instability," for which Mr. French did not have any preexisting symptoms. (*Id.* ¶ 38; *Id.*, Ex. E at HA00189.) This "lumbosacral instability," Dr. DePhillips wrote, led to the need for Mr. French's spinal fusion. (*Id.*) Dr. DePhillips also recognizes in this letter that [Mr. French] "has spondylolysis which did preexist the [June 2003] injury, the treatment which the patient was given was based on a diagnosis of instability . . . and not the spondylolysis that preexisted the injury." (*Id.* ¶ 38; *Id.*, Ex. E at HA00189.)

Hartford referred Mr. French's appeal to the University Disability Consortium ("UDC") for an independent medical review by a board-certified specialist physician, who was asked to determine whether there was a relationship between Mr. French's medical problems subsequent to June 9, 2003 and his preexisting spondylolysis and spondylolisthesis of the lower lumbar spine. (D.E. 22 ¶¶ 39-40.) Dr. Barry Turner, a Board certified orthopedic surgeon, conducted the independent review, which included, *inter alia*, both Plaintiff's medical records and Dr. DePhillips's May 28, 2004 letter. (*Id.*

14

¶ 40.) Upon reviewing these materials, Dr. Turner concluded that there was no evidence that Mr. French's June 9, 2003 incident led to any significant injury. (*Id.* ¶ 41.) Instead, Dr. Turner explained, "spondylolysis and spondylolisthesis was definitely pre-existing and surgical procedure was done to correct both conditions . . . and this is confirmed in the operative reports of Dr. DePhillips." (*Id.*) Dr. Turner identified numerous reports in Mr. French's medical history that supported this finding, including French's July 2, 2003 CT scan, which indicated the spondylolysis was the result of a congenital disorder, the December 3, 2003 discogram, which revealed no instability, and Dr. Shermer's September 11, 2003 evaluation, which, among other things, found no disc herniation or new injury as a result of the June 9, 2003 incident. (*Id.* ¶¶ 42, 43.) Dr. Turner also noted Dr. DePhillips's comment in his October 22, 2003 letter stating that Mr. French's "injury of 6/9/03 caused an exacerbation of a pre-existing condition, that is spondylolisthesis at the L5-S1 level." (*Id.* ¶ 44.) Although Dr. Turner recognized that Dr. DePhillips stated in his January 13, 2004 preoperative report that he was performing Mr. French's spine surgery to correct "spinal instability," DePhillips stated in the same report that there was no instability noted on flexion-extension views of the lumbar spine. (*Id.* ¶ 45.) Dr. Turner explained that he disagreed with Dr. DePhillips's June 21, 2004 statement that Mr. French's spinal fusion was conducted because of "instability" and stated that the "[s]urgical procedure was not done to correct any instability because in fact, there was no evidence of instability on physical examination or radiological studies." (*Id.* ¶ 44.) In sum, Dr. Turner credited the opinion of Dr. DePhillips and others that Plaintiff's June 9, 2003 injury exacerbated his pre-existing spondylolysis and spondylolisthesis, which necessitated Plaintiff's surgery. Conversely, Dr. Turner discredited Dr. DePhillip's

statement that Plaintiff's June 3, 2003 injury caused him "lumbosacral instability" necessitating surgery.

Hartford appeals specialist Robyn J. Cote received Dr. Turner's report and informed Plaintiff's counsel in a letter dated August 31, 2004 that, based on a review of the materials referenced in Hartford's March 2, 2004 letter and the materials subsequently received, as well as Dr. Turner's review of the relevant materials, Hartford had concluded that Plaintiff's "condition and treatment after June 9, 2003 are directly related to his pre-existing condition and treatment" and, therefore, Plaintiff was not eligible for LTD benefits under the terms of the Policy. (*Id.* ¶ 46; *Id.*, Ex. E at HA000144-149.) Subsequent to receiving Cote's letter, Plaintiff filed the present suit.

## E.    Plaintiff's Weekly Disability Benefits

Although Plaintiff was denied LTD Benefits, he received limited (and seemingly, short-term, although nothing turns on the phrase "short term") "Weekly Disability" benefits pursuant to the terms of the Policy from July 10, 2003 through January 7, 2004. (D.E. 22 ¶ 47.) Under the Policy, such "Weekly Disability" benefits are based on an insured's average weekly earnings. (*Id.* ¶ 49.) Because Mr. French did not sign up for Weekly Disability benefits when he was first eligible, the Policy provides that his Weekly Disability benefit shall be 40% of his previous year's average weekly earnings. (*Id.* ¶ 48.) Defendant claims that Mr. French's average weekly earnings for the 26 regular pay periods prior to June 9, 2003 were $304.92, although Defendant explains that there were six pay periods included in this average in which Plaintiff did not work at all, and thus was not paid anything. (*Id.* ¶ 50.) Defendant asserts that it paid Plaintiff 40% of

16

$304.92, or $121.97 in Weekly Disability benefits during the period from July 10, 2003 through January 7, 2004. Plaintiff claims, without any support in the record, that his average weekly wage for purposes of calculating these benefits should not be $302.94, but should instead be $446.90. (D.E. 24 ¶ 14.) Both parties have moved for summary judgment on the issue.

## III.   ANALYSIS

### A.   Plaintiff's Motion for Summary Judgment Is Untimely and Not Properly Presented Within The Framework Established By the Local Rules and Related Caselaw and Plaintiff Has Failed to Properly Oppose Defendant's Motion for Summary Judgment

The Court initially notes that Plaintiff's summary judgment motion materially fails to comply with Local Rule 56.1 and caselaw interpreting and applying it.[5] For example, while Plaintiff belatedly filed a self-styled "Motion for Summary Judgment," (D.E. 24), he failed to file significant supporting documents as specifically required by Local Rule 56.1—namely, the Local Rule 56.1 statement of material facts and supporting evidentiary material. *See* L.R. 56.1. Under the express terms of Local Rule 56.1, "[f]ailure to submit such a statement constitutes grounds for denial of the [summary judgment] motion." *Id.* In addition, the factual assertions Plaintiff makes in his summary judgment motion almost entirely lack record support, let alone appropriate citations to the Rule 56.1 factual filing. Instead, in the four instances where Plaintiff offers any support for his assertions, he improperly cites to raw discovery record material

---

[5] Plaintiff's motion was untimely under deadlines set by the Court, but the Court does not rule on such basis. (See D.E. 18 & D.E. 24.) Nonetheless, Plaintiff is respectfully requested to abide by the Court's schedules in the future, and he is respectfully advised that failure to do so can have negative consequences. *See, e.g., Spears v. City of Indianapolis*, 74 F.3d 153, 156 (7th Cir. 1996).

not attached to his filing. This citation practice is materially improper. *See, e.g., Malec* 191 F.R.D. at 586 ("Citations in the fact section [of a memorandum] should be to the 56.1(a) or (b) statement of facts only, unlike Malec's memorandum, which cites directly to pieces of the record"); *accord, e.g., Madaffari v. Metrocall Cos. Group Policy GL*, No. 02 C 4201, 2005 WL 1458071, *1 (N.D. Ill. June 15, 2005) (St. Eve, J.) ("[W]hen citing to the record in their legal memoranda, parties are required to cite to the numbered paragraphs of their Local Rule 56.1 statements and not to the underlying parts of the record") (citing, *inter alia, Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 826 (N.D. Ill. 2005)).

The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."); *see also id.* ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions. . . ."). This rule, for example, prompts the Court to disregard the allegations in paragraphs 3-5 and 9 of Plaintiff's Motion for Summary Judgment, as these statements are unsupported by a citation to the record. Plaintiff also improperly fails to cite to the

Rule 56.1 statement (as he did not file one, as discussed above), and that failing will not be excused either.[6]

In addition to failing to support his own motion for summary judgment, Plaintiff fails to oppose Defendant's summary judgment motion or to respond to that motion at all. Local Rule 56.1 requires a party opposing summary judgment to file a supporting memorandum of law and a response to movant's statement of undisputed facts. *See* L.R. 56.1. Plaintiff has filed neither. Where a party improperly denies a statement of fact, or in this case, fails to admit or deny such a statement, the Court deems admitted that statement of fact, at least where it is properly supported by record material. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission).

Although the Court is not required to do so, it has also reviewed the record to see if a broader look at the materials submitted suggests that summary judgment is appropriate or inappropriate as to either party. To the extent one were inclined to throw out the procedural rules and engage in this endeavor (and the Court does not rule on such basis, but merely points out that the result comes out the same either way), the record materials provided fail to indicate that Defendant's decisions regarding Plaintiff's claim for benefits under the Plan were arbitrary and capricious.

## B.     The Plan Administrator's Decision To Deny LTD Benefits Was Not Arbitrary and Capricious

---

[6] This deficiency is not outcome determinative; however, the Court will enforce the local rule in this regard.

Defendant moves for summary judgment on the grounds the Plan Administrator's decision to deny Plaintiff LTD Benefits was not arbitrary and capricious. Defendant asserts that Hartford rightly concluded that Plaintiff's claim for LTD Benefits arose from a preexisting condition that was excluded from coverage under the Policy. Plaintiff contends that Hartford's decision to deny him LTD Benefits was arbitrary and capricious[7] (D.E. 13 ¶ 9), and that his claim for LTD Benefits did not arise from an excluded preexisting condition. (D.E. 24 ¶¶ 12-13.) Specifically, Plaintiff points to Dr. DePhillips's June 21, 2004 letter, which, Plaintiff asserts, explains that Plaintiff sustained a non-preexisting injury on June 13, 2003. (*Id.*) Although Plaintiff does not mention as much in his summary judgment motion, Plaintiff asserts in his Amended Complaint that "Defendant failed to consider evidence offered by Plaintiff establishing that his injury was not in relation to any preexisting condition." (D.E. 13 ¶ 8.) Plaintiff does not specify what evidence Defendant failed to consider.

---

[7] Where a defendant is both an insurance company and a Plan administrator, courts sometimes are called upon to consider whether a defendant operated under a conflict of interest in denying benefits. *See generally Rud v. Liberty Life Assurance Co. of Boston*, 438 F.3d 772, 777 (7th Cir. 2006). The Seventh Circuit has not readily found such a conflict, but, at least under certain, relatively limited circumstances, it has allowed for the possibility of such a conflict that might warrant review more demanding than the deferential "arbitrary and capricious" standard explicated herein. *See, e.g., id.* Plaintiff has not asserted in his Complaint or in his summary judgment motion that Defendant has a conflict of interest. Under applicable precedent, it is Plaintiff's burden to establish a conflict of interest; the Plan has no affirmative burden to demonstrate a lack of one. *See, e.g., Dougherty,* 440 F.3d at 916 (collecting cases). As there is no evidence (or even assertion) of a conflict of interest, the Court finds that none exists, and that Defendant is entitled to ordinary arbitrary and capricious review. *See, e.g., id.,* 440 F.3d at 915-916 (citing, *inter alia, Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 774 (7th Cir. 2006)). In this regard, the Court is to presume a plan is "acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Dougherty,* 440 F.3d at 916 (quoting *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) (further internal quotation marks and citation omitted)).

In considering the entire record presented, Defendant's denial of Plaintiff's LTD

Benefits was not arbitrary and capricious. It is uncontested that Plaintiff suffered back

pain while loading freight on June 9, 2003. (D.E. 22 ¶ 22; D.E. 13 ¶ 6.) As stated above,

Defendant assumes *arguendo* for present purposes that Plaintiff's back pain rendered him

disabled. (D.E 21 at 11 n.2.) The issue in question therefore is whether the disability

Plaintiff now claims is "due to, contributed to or by, or results from a Pre-Existing

Condition"—*i.e.*, a "Disability for which [he] receive[d] Medical Care during the 365 day

period which end[ed] on the day before" September 19, 2002 (the undisputed effective

date of Plaintiff's coverage under the Plan). There is no dispute that Plaintiff suffered

from spondylolisthesis that prexisted his June 9, 2003 injury. (D.E. 24 ¶ 13.) There is

also no dispute, and the record supports, that Plaintiff injured his back and sought

medical care for that injury during the 365 days before he enrolled in the Plan for back

pain and that subsequent tests conducted in relation to that pain revealed that Plaintiff

had "Grade I spondylo of L5 on S1" and "minimal or trace" "[s]pondylolisthesis at L5."

(D.E. 22, Ex. E at HA00676.) These conditions are therefore excluded pre-existing

conditions under the terms of the Policy—or, to be more precise, this Court has no

legitimate basis, under the applicable standard of review, to disturb the Defendant's

assessment of the medical history and administrative record in this regard. *Accord, e.g.*,

*Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 432 (7th Cir. 1994)

(affirming, even under *de novo* review applicable in that case to defendant/plan's actions,

the grant of summary judgement to defendant/plan after it denied medical coverage for

cancer treatment under a preexisting condition exclusion; insured sought medical

21

treatment for a breast lump before the inception of coverage, and lump was not discovered to be cancerous until after coverage had begun).

Under the arbitrary and capricious standard, it is not this Court's function to decide whether it would reach the same conclusion as the Plan or decide whether the Plan made the best assessment of the record. *See, e.g., Dougherty*, 440 F.3d at 917 ("Under this standard . . . we will uphold a benefit decision so long as that decision has rational support in the record. Questions of judgment are left to the plan administrator, and it is not our function to decide whether we would reach the same conclusion as the administrator.") (internal quotation marks and citation omitted) (collecting cases); *Krawczyk*, 41 F.3d at 279 (similar). Instead, to review a claim decision, the Court evaluates whether the plan administrator (1) considered the factors relevant to the decision, and (2) articulated an explanation that makes a "rational connection" between the issue, the evidence, the text, and the decision made. *See, e.g., Exbom v. Central States, S.E. and S.W. Areas Health and Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990) (internal quotation marks and citations omitted). As explained below, the Court finds that Hartford was not arbitrary and capricious in denying Plaintiff's claim for LTD Benefits, but rather it considered relevant factors and articulated an explanation for its decision that is rationally connected to the issues, evidence, and Policy at hand.

In its denial of Plaintiff's claim for LTD Benefits on March 2, 2004 and in its denial of Plaintiff's appeal, Hartford explained the relevant factors to its coverage decision and discussed why they were relevant. Hartford sought and received an opinion as to whether Plaintiff's claimed Disability was caused by a preexisting condition from

an independent physician, Dr. Turner, a board-certified orthopedic surgeon, who found that it was. In rendering its decision, Hartford adequately considered the evidence it received from Plaintiff and/or his doctors. Consequently, this Court holds that Hartford adequately considered the factors relevant to its decision—whether Plaintiff was eligible for LTD Benefits. "It is well established that a plan fiduciary may rely on the opinion of a well qualified consulting physician in declining a disability claim under ERISA." *Chionis v. Group Long Term Disability Plan for Edward Health Servs. Corp.*, No. 04 C 4120, 2006 WL 1895951, *6 (Jul. 7, 2006) (citation omitted); *accord, e.g., Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). "Indeed, the Seventh Circuit has recognized that an administrator's decision to seek independent expert advice is evidence of a thorough investigation." *Chionis*, 2006 WL 1895951 at *6 (citing *Hightshue*, 135 F.3d at 1148).

Moreover, in its letter denying Plaintiff's appeal, Hartford provided an explanation that made a rational connection, as required, between its decision, the Policy, and the evidence. Hartford concluded that Plaintiff's claimed Disability—back pain beginning while loading freight on June 9, 2003 and the subsequent surgery to relieve that pain—resulted from spondylolysis with spondylolisthesis, a condition Plaintiff was treated for following his September 8, 2002 injury.[8] In support of this conclusion, Hartford cited Perry Memorial Emergency Room records from Plaintiff's September 8, 2002 visit stating that he had "lumbar strain," Plaintiff's September 10, 2002 x-ray

---

[8] Under the terms of the Policy, since Plaintiff enrolled on September 19, 2002, any Disability for which he received Medical Care in the 365 days prior to September 18, 2002 (the 365 day period that ended on the day before his effective date of insurance) might be deemed a Pre-Existing Condition.

indicating that he had "spondylolysis with grade 1 L5-S1 spondylolisthesis,"[9] Plaintiff's

September 11, 2002 x-rays indicating a "bilateral pars defect," and Dr. DePhillips's

October 22, 2003 letter indicating that "the injury that occurred on 6/9/03 caused an

exacerbation of a preexisting condition, that is spondylolisthesis at the L5-S1 level." As

a result, Hartford found Plaintiff ineligible for LTD Benefits for his claimed Disability

under the terms of the Policy, as the Disability resulted from a preexisting condition and

was therefore excluded from coverage. (D.E. 22, Ex. E. at HA00145-152.)

Although Plaintiff fails to make an argument as to how Hartford acted arbitrarily

and capriciously in denying his claim for LTD Benefits, his primary argument for

summary judgment in his favor (and, presumably, his argument against summary

judgment in Hartford's favor, had he made one), is that Dr. DePhillips "specifically

stated that the Plaintiff's current disability is related to lumbosacral instability and the

spinal fusion was performed with instrumentation for the instability and mechanical low

back pain caused a result of the injury that was sustained on June 13, 2003." (D.E. 24 ¶

12.)

---

[9] Defendant represented to the Court and in its coverage determinations to Plaintiff that Plaintiff's September 10, 2002 x-ray showed "spondylolysis with grade 1 L5-S1 spondylolisthesis." (D.E. 22 ¶ 15; HA00105.) In reviewing the record, however, it appears instead that the report from St. Margaret's Hospital of Plaintiff's September 10, 2002 "Three View Lumbar Spine" x-ray actually revealed "minimal retrolisthesis of L4 and L5." (D.E. 22, Ex. E. at HA00633.) While the Court understands "retrolisthesis" and "spondylolisthesis" to be the same condition, see http://www.emedicine.com/radio/byname/spondylolisthesis.htm (stating that retrolisthesis is a "synonym, key word, or related term" to spondylolisthesis) (last visited August 1, 2006), even if they are not, the Court's holding in this matter would be unchanged because Plaintiff admits that there is record evidence that his "spondylolisthesis [] prexisted this [June 2003] injury" and because the additional record evidence discussed herein supports such a finding. (D.E. 24 ¶ 13.)

As a threshold matter, it merits noting that, "an ERISA administrator is not [specifically] required to explain why it credits reliable evidence that conflicts with a treating physician's opinion." *Chionis*, 2006 WL 1895951 at *6 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Nonetheless, Hartford has done so, and has provided a rational and reasonable explanation as to why it chose not to credit Dr. DePhillips's statement that Plaintiff's "current disability is related to lumbosacral instability" within the context of all the evidence in the record. The record considered by Hartford and by the Court here leads to a conclusion that Hartford's coverage determination was not unreasonable. When a claim administrator receives two or more differing opinions as to a claimant's medical history, it has discretion, at least under the applicable arbitrary and capricious review, in choosing between reasonable diagnoses when determining whether or not to award benefits. *See, e.g.*, *Dougherty*, 440 F.3d at 917 (collecting cases); *Kobs*, 400 F.3d at 1039; *Hightshue*, 135 F.3d at 1148-49. The record reveals that although Dr. DePhillips stated in his June 21, 2004 letter that Plaintiff's claimed disability was a result of "instability and mechanical lower back pain" and not of spondylolysis and spondylolisthesis, additional medical documentation—including documentation written by Plaintiff's doctors, and even including Dr. DePhillips—renders the opposite opinion.

Specifically, in his letter of October 22, 2003 to Plaintiff's counsel, Dr. DePhillips stated "[i]t is my opinion within a reasonable degree of medical and surgical certainty that the injury that occurred June 9th of this year caused an exacerbation of a pre-existing condition, that is spondylolisthesis at the L5-S1 level." (D.E. 22 ¶ 26; *Id.*,

Ex. E. at HA00530-533, HA00563.) In his preoperative report on Plaintiff's surgery, Dr. DePhillips stated that Plaintiff's "admitting diagnosis" was "segmental instability L5-S1 with discogenic low back pain and spondylolysis." (*Id.* ¶ 29; *Id.*, Ex. E at HA00337-338.) In this same document, however, Dr. DePhillips states that flexion and extension x-rays did not show gross instability at the L5-S1 level. (*Id.; Id.*) In his "Operative Report," Dr. DePhillips again states that Plaintiff's preoperative and postoperative diagnosis was "L5/S1 bilateral spondylolysis with intractable pain and grade 1 spondylolisthesis." (D.E. 22, Ex. E at HA00545; *see also id.*, Ex. E at HA00549-550) (Dr. DePhillips statement on an "Admitting Department Notification of Scheduled Surgery" dated January December 24, 2003 that the "Diagnosis" is "spondylolisthesis.") Hartford found that Dr. DePhillips did not have any proof of instability, and that the available evidence, including Dr. DePhillips's operative reports and the radiological studies, indicated that Plaintiff's surgical procedure was conducted to correct the preexisting conditions of spondylolisthesis and spondylolysis. (*Id.* at HA00148.)

In addition to Dr. DePhillips's contrary statements, the record also shows that Dr. Michel Malek explained, following his consultation with Plaintiff on December 19, 2003, that "I think his symptoms are the basis of his L5 spondylolysis and mild L5-S1 spondylolisthesis combined with discogenic pain. I think these findings pre-existed his injury, but probably aggravated his injury that rendered it symptomatic." (D.E. 22 ¶ 28; *Id.*, Ex. E., HA00527-529.) Dr. Malek did not diagnose any "instability." (*Id.*) Similarly, Dr. Shermer diagnosed Plaintiff with spondylolisthesis in September 2003 without noting any instability. (D.E. 22 ¶ 25; *Id.*, Ex. E at HA00749-755.) Dr. Glaser

also noted no evidence of instability when he reviewed Plaintiff's December 2003 lumbar discography, and instead diagnosed lumbar discogenic pain and lumbar spondylolysis. (D.E. 22 ¶ 27; *Id.*, Ex. E at HA00551-552.)

The Court may not simply substitute its judgment for Hartford's as to whether Plaintiff's back pain on June 9, 2003 and subsequent treatment was caused by preexisting spondylolysis and spondylolisthesis. *Accord, e.g., Dougherty*, 440 F.3d at 917. Rather, the Court "must determine whether, in light of the relevant facts, . . . [Defendant] articulated a satisfactory explanation for its action, including a rational connection between the facts and the choice made." *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936-937 (7th Cir. 1989) (explaining that plaintiff had failed to satisfy the "difficult burden of showing that . . . [defendant's] decision to deny him benefits was arbitrary and capricious, not merely proffer arguments that the decision was wrong."). As explained above, Hartford has offered such a rational connection here. Although Hartford likely *could* have rationally credited Dr. DePhillips's statements and the January 12, 2004 presurgical report that Plaintiff's disability was caused by non-preexisting "instability"and not spondylolisthesis over Dr. DePhillips's contrary statements (and lots of other evidence) that the disability was caused by the preexisting spondylolysis and spondylolisthesis, it was not unreasonable for Hartford to refuse to do so, particularly in light of the other evidence in the record weighing against any such conclusion. (*Id.*)

The Court therefore grants Defendant's motion for summary judgment as it relates to Plaintiff's claim for LTD Benefits. Defendant has established, within the framework established by Local Rule 56.1 and the extensive caselaw applying it, that

Defendant did not act in an arbitrary and capricious manner in denying Plaintiff LTD benefits.

## C. The Court Cannot Definitively Determine Whether Hartford's Calculation of Mr. French's Weekly Disability Benefits Was Arbitrary and Capricious

The dispute about the Weekly Disability benefits Plaintiff received from July 10, 2003 through January 7, 2004 centers around whether those benefits were of the amount required by the Policy. The Policy provides that the amount of Weekly Disability benefits should be based on the insured's average weekly earnings. "Earnings" are defined in the Policy as "[r]egular pay including bonuses and overtime pay (but not counting commissions, or any other pay or fringe benefit) paid during the past 26 regular pay periods and divided by 52 weeks." (D.E. 22 ¶ 49; *Id.*, Ex. D at HA00035-HA00036.) The Policy also provides that "[i]f you do not sign up for Weekly Disability coverage when first eligible, and you become Disabled during your first year of coverage, your benefit will be reduced to 40% and will remain 40% for the duration of the claim." (*Id.* at HA00035.)

Defendant claims that under the Policy, Plaintiff was only entitled to Weekly Disability benefits in the amount of 40% of his average weekly wage for the year preceding his June 9, 2003 injury. (D.E. 22 ¶ 48.) Defendant also claims that Plaintiff's average weekly earnings for the 26 regular pay periods prior to June 9, 2003 were $304.92, and thus when it paid Plaintiff $121.97 per week, or 40% of $304.92, it did so in accordance with the Policy terms. (D.E. 21 at 9-10.) In support of its claim that Plaintiff's average weekly earnings for the 26 pay periods prior to June 9, 2003 were

$304.92, Defendant cites only Hartford's letters to Plaintiff stating as much and what it calls a "Benefit Management Services Computer Screen." (D.E. 22 ¶ 50; *Id.*, Ex. E at HA00148, HA00740.) All of these documents reach the conclusion that Plaintiff's average weekly earnings for calculation of Weekly Disability benefits should be $304.92, but none of these documents provides conclusive support for Defendant's position or specifically illustrates the underlying foundation for Defendant's position.

The Court would likely be within the bounds of applicable precedent in finding that Plaintiff has failed to adduce a triable case on the Weekly Disability benefits issue; the Seventh Circuit has repeatedly and pointedly stated that summary judgment is the "put up or shut up" point of a case, where the non-movant must put its evidence forward sufficient to establish a triable case or suffer the consequences. *See, e.g., Koszola*, 385 F.3d at 1111 ("As we have often stated, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (collecting cases; further internal quotation marks and citations omitted). Nonetheless, the Court will afford Plaintiff the benefit of the doubt, given the at-least-arguable infirmity or inadequacy of Defendant's evidentiary foundation for its wage calculations, and will deny without prejudice Defendant's summary judgment motion concerning the Weekly Disability benefits.

In Plaintiff's "summary judgment motion" on this matter, he does not dispute that he was only entitled to 40% of his average weekly earnings as Weekly Disability benefits, but instead disputes that Hartford calculated the amount correctly. As previously explained, Plaintiff has not filed the requisite Rule 56.1 statement, and his

motion therefore is infirm on that basis alone. *See* L.R. 56.1 ("Failure to submit such a statement constitutes grounds for denial of the [summary judgment] motion."); *see also Koszola*, 385 F.3d at 1109 (district court appropriately should and may enforce local rules) (collecting cases); *Curran*, 153 F.3d at 486 (similar).

The Court further notes that Plaintiff claims that "pursuant to an Industrial Commission Decision, the Illinois Industrial Commission has determined the Plaintiff's average weekly wage to be Four hundred Forty-six dollars and 90 cents (446.90) and any short-term or long-term disability paid to the Plaintiff under the policy should be paid based upon [this] average weekly wage. . . ." (D.E. 24 ¶ 14.) Plaintiff does not attach the referenced "Industrial Commission Decision," much less present it as required through a Rule 56.1 statement.

As explained, Plaintiff failed to file any of the appropriate factual documents under the Local Rule 56.1 framework. Nonetheless, in the Court's independent review of the administrative record provided by Defendant, the Court saw a May 28, 2004 letter from Plaintiff's counsel to Hartford arguing that Plaintiff's average weekly wage was $446.90. (D.E. 22 ¶ 52; *Id.*, Ex. E at HA00173.) Plaintiff's counsel had attached to that letter an "Earnings History Report" and an "Arbitration Decision" relating to a workman's compensation case between Plaintiff and Wal-Mart. (*Id.* at HA00173-HA00185.)

Even if the Court were to consider Plaintiff's counsel's May 28, 2004 letter and attachments—which would not be proper given that Plaintiff did not properly present them—the Court would not find that these materials warrant summary judgment in

30

Plaintiff's favor. The "Earnings History Report" that Plaintiff's counsel attached to his May 28, 2004 letter only includes wages Plaintiff earned in the period from December 29, 2000 through September 6, 2002. Plaintiff makes no argument to support any finding that these wages could, under the terms of the Policy, lead to an accurate calculation of the wages Plaintiff earned in the "26 regular pay periods" prior to his June 9, 2003 injury. Additionally, as this document does not even include the wages Plaintiff presumably earned between September 6, 2002 and June 9, 2003, it fails to provide a basis for a finding that Defendant' calculation of Plaintiff's Weekly Disability benefits was incorrect, let alone unreasonable.

Plaintiff's counsel also argues in his May 28, 2002 letter to Hartford—and, without support, in his motion for summary judgment—that the Illinois Industrial Commission decision compels a finding that Mr. French's average weekly earnings were $446.90. (D.E. 24 ¶ 14.) Plaintiff has made no argument to this Court explaining how the decision of Arbitrator James J. Giordano in that case, styled *Dan French v. Wal-Mart Stores, Inc./Sam's Club*, Illinois Industrial Decision, No. 02 WC 49642/03 WC 34241, could bind Hartford, which seemingly was not a party to the action.[10] Moreover, and

---

[10] Plaintiff also fails to cite any authority that an Illinois Industrial Commission is persuasive, let alone binding, as he would have it, in a wholly separate ERISA action. Precedent teaches that administrative decisions are not necessarily so. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) (distinguishing disability determinations by the Social Security Administration ("SSA") because they are measured against a "uniform set of federal criteria," from ERISA disability determinations that turn on "interpretation of terms in the plan at issue"); *Coker v. Met. Life Ins. Co.*, 281 F.3d 793, 798 (8th Cir. 2002) (collecting cases and holding that SSA determination of disability did not require plan administrator to reach the same conclusion); *see also Anderson v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans*, 991 F.2d 356, 358-59 (7th Cir. 1993) (failure to consider SSA disability finding was not unreasonable even though plan administrator had never disagreed previously with SSA findings).

31

independently, even if this Court were to assume for present purposes that the Illinois Industrial Commission decision could potentially be binding on Hartford, Plaintiff wholly fails to demonstrate that the Arbitrator's decision in *Dan French v. Wal-Mart Stores, Inc./Sam's Club* was even rendered based on the same facts and Policy terms that are at issue here. Therefore, the Court is unable to determine whether Arbitrator Giordano was applying the same facts, terms, or standards applicable here. For these various independently adequate reasons, Plaintiff's summary judgment motion as to the appropriate amount of Weekly Disability benefits is denied.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (D.E. 20) is granted in part and denied in part. Plaintiff's Motion for Summary Judgment (D.E. 24) is denied.

If the parties choose, they may promptly file summary judgment motions concerning the Weekly Disability benefits issue. The amount of money at issue on that score appears to be quite limited, so the parties are encouraged to discuss informally whether they can reach a resolution more cheaply for their clients than would be achieved through the preparation of additional summary judgment materials. The parties should be prepared at the next status to discuss with the Court whether any such filings are appropriate. So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 8-2-06